**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | )   **CASE NO. 5:14-CR-55 (MTT)** |
| | ) |
| **WAYNE WALKER,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER

Before the Court is Defendant Wayne Walker's motion to suppress. (Doc. 17). The Court held a hearing on the Defendant's motion on October 21, 2014. Based on the evidence presented at that hearing, the argument of counsel in their briefs, and applicable law, the Defendant's motion to suppress is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

On February 28, 2014, Sergeant Travis Douglas and Deputy Jason Douglas were on patrol in Jones County, Georgia, when their lieutenant informed them there was an arrest warrant for Michael Upshaw who possibly was staying at 111 Moore Place, Wayne Walker's residence. (Doc. 17-1 at 4). At 9 p.m. and again at 11 p.m., the officers drove to Walker's home and saw lights on inside. (Doc. 17-2 at 2). The officers knocked on the "back" door, which was the door nearer the driveway to the house from Moore Place,[1] but made no contact either time. (Doc. 17-2 at 2). During the 11 p.m. visit, the officers noticed a "still hot" Honda Civic which was not there before. (Doc. 17-1

---

[1] At the hearing, the officers gave seemingly inconsistent testimony whether either of them knocked on the front door, but both testified they knocked on the back door adjacent to the carport. Both testified this is the same entrance where the officers eventually entered the home. The "front" of the house faces Highway 49, and there is no entrance to the house from Highway 49.

at 4).  At the hearing, the officers testified the car was parked under a carport adjacent to the back door.  The officers drove by a third time at 5:04 a.m. on March 1, 2014, and saw the Civic's dome light on and someone, who turned out to be Walker, asleep inside with his head on the steering wheel.  (Doc. 17-1 at 4).  Sergeant Douglas tapped the window and called for Walker who then awoke.  (Doc. 17-2 at 2).  The officers noticed crumpled up money and what looked like a knife in the front passenger's seat and then asked Walker to step out of the vehicle.  (Doc. 17-1 at 4).  Walker complied and was told the officers were looking for Upshaw.  (Doc. 17-2 at 2).  Walker informed them Upshaw was not there but invited the officers to search his home for Upshaw.  (Doc. 17-2 at 2-3; Doc. 20 at 6).  According to the officers, Walker did not seem impaired and carried on an intelligent conversation.  (Doc. 20 at 6).

As Walker led them inside, the officers noticed a $10 bill and a $100 bill on the ground and instructed Walker to pick them up; Walker complied and put the bills in his jacket pocket.  (Doc. 17-1 at 5).  They entered the home through the back door adjacent to the carport.  (Doc. 21 at 5).  Deputy Douglas searched for Upshaw but with no success.  (Doc. 17-1 at 5).  However, while looking behind a large chair, the deputy saw sheets of $100 bills printed on white paper and a $50 counterfeit bill on a shelf.  (Doc. 17-1 at 5).  When Sergeant Douglas asked Walker about this money, Walker became nervous and "kept moving his hands around."  (Doc. 17-1 at 5).  Concerned Walker could be armed, Sergeant Douglas frisked Walker and found counterfeit money in his pockets, including the money Walker had picked up off the ground.  (Doc. 17-2 at 3-4).  Walker said the money belonged to Upshaw.  (Doc. 17-2 at 4).

The officers believed they had probable cause because the counterfeit money was in plain view and in Walker's pockets, so Sergeant Douglas arrested and Mirandized Walker.  (Doc. 17-1 at 5).  Around the same time, Walker's fiancée came in the room to whom Walker blurted out that the officers were there for the money Upshaw left.  (Doc. 17-2 at 4).  Then, before taking Walker to the station, the officers conducted a warrantless search of Walker's residence and his Honda Civic.  (Doc. 17-2 at 5-6).  During this search, the officers seized more counterfeit money as well as equipment used to make the money.  (Doc. 17-2 at 5-6).

On March 2, 2014, Sergeant Douglas and Deputy Douglas took Walker to the interview room at the Jones County Sheriff's Office, where he was again read his Miranda rights.  (Doc. 17-1 at 8).  Walker said he understood his rights, agreed to speak, and signed a Waiver Certificate.  (Doc. 17-1 at 8; Doc. 20-1).  Walker confessed he had printed the money "to perfect" it, but had never "passed" it.  (Doc. 17-1 at 8; Doc. 17-2 at 7).  On March 4, 2014, Agent Lyman interviewed Walker and read him his Miranda rights.  (Doc. 20 at 14).  Walker said he understood and waived his rights.  He informed Agent Lyman there was more counterfeit money in his truck and gave Lyman consent to search it.  (Doc. 20 at 15).

On August 13, 2014, Walker was indicted for Manufacturing Counterfeit Obligations of the United States in violation of 18 U.S.C. § 471.  (Doc. 1).  He filed a motion to suppress on September 9, 2014.  (Doc. 17).  Walker moves to suppress all evidence in all forms obtained by law enforcement, including any tangible evidence seized, any "physical observations" by the officers, and any statements Walker made before or after his arrest.  (Doc. 21 at 1-2).  This evidence specifically includes (1) the

counterfeit money on the shelf; (2) the counterfeit money in Walker's pockets; (3) the counterfeit money and equipment used to make the money found in Walker's home and in his car; and (4) any statements made to law enforcement while in custody.

## II.  MOTION TO SUPPRESS STANDARD

Motions to suppress evidence present mixed questions of law and fact for the Court's determination.  *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991). The individual moving for suppression of evidence bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed.  *United States v. Ross*, 827 F. Supp. 711, 716 (S.D. Ala. 1993).  Once the movant has established a basis for his motion, the burden then shifts to the Government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified.  *Id.*

## III.  DISCUSSION

Walker moves to suppress the evidence seized and custodial statements made on the sole ground the evidence and statements are fruits of the poisonous tree stemming from the allegedly unlawful search on Walker's curtilage before consent was given.  Thus, the Court will first address whether the police officers unlawfully searched Walker's curtilage by "investigating" the dome light in the Civic at 5 a.m.  Then, the Court will address the Government's arguments about the specific evidence.

### A.  Whether Sergeant T. Douglas and Deputy J. Douglas's Initial "Investigation" Was an Unlawful Search

Walker argues Sergeant Douglas and Deputy Douglas unlawfully searched Walker's curtilage when they investigated the dome light in Walker's vehicle at 5 a.m. (Doc. 21 at 5).  Thus, Walker contends all subsequent evidence seized and custodial

statements made should be suppressed as fruits of the poisonous tree of this allegedly unlawful search. (Doc. 21 at 5; Doc. 29 at 1). The Government replies the officers' actions before Walker gave consent were lawful under the "knock and talk" exception to the warrant requirement, and their actions were not a search implicating the Fourth Amendment. (Doc. 30 at 1).

Pursuant to the "knock and talk" doctrine, "'[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may.'" *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (quoting *Estate of Smith v. Marasco*, 318 F.2d 497, 519 (3d Cir. 2003)). "The Fourth Amendment … is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Departure from the front door does not necessarily exceed the scope of a lawful "knock and talk." *See id.* at 1205 (citing *United States v. Hammett*, 256 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence.")).

Here, as in *Taylor*, the initial entry onto Walker's property was for a "knock and talk." Both officers testified at the hearing that all three entries onto Walker's property were to make contact with a resident to inquire about Upshaw. Although the officers knocked on the door and made no contact the first two visits, they saw a man inside a vehicle on the third visit. They then "departed" from the typical "knock and talk" on the front door by knocking on the car door instead. But the officers' purpose was still to speak with Walker who was inside his vehicle next to the home, "as any citizen may."

This departure, if it was a departure, did not exceed the scope of a lawful "knock and talk" and did not constitute a search under the Fourth Amendment.[2]  *See id.* at 1205.  In sum, the officers conducted a valid "knock and talk," and Walker freely gave voluntary consent to search his home.  Thus, the Court will not suppress any evidence seized as fruits of the poisonous tree of this initial entry.

**B.  The Counterfeit Money on the Shelf[3]**

Because the officers had Walker's voluntary consent to search his residence, the Government contends the sheets of counterfeit paper on the shelf should not be suppressed because the evidence was in plain view.  (Doc. 20 at 7).  "Under the plain view doctrine, the warrantless seizure of an item is permissible where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."  *United States v. Folk*, 754 F.3d 905, 911 (11th Cir. 2014) (internal quotations and citations omitted).  The second prong "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband."  *Id.* at 912 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)) (internal quotation marks omitted).

As explained above, Sergeant Douglas and Deputy Douglas were lawfully inside Walker's residence because he freely and voluntarily gave them consent to search for

---

[2] Walker argues the visit at 5 a.m. was presumptively unreasonable because Federal Rule of Criminal Procedure 41(e)(2)(ii) requires officers to execute search warrants only during the daytime (6 a.m.-10 p.m.) unless expressly authorized by a judge for good cause.  (Doc. 21 at 8).  The Government replies the "knock and talk" comported with O.C.G.A. § 17-5-26 which allows a warrant to be executed at any reasonable time.  (Doc. 30 at 2).  The Court concludes that 5 a.m. is not an unreasonable time that would compel the conclusion the "knock and talk" was unlawful, particularly given the circumstances here.

[3] Walker maintains the fruit of the poisonous tree argument as the sole ground all evidence should be suppressed.  Thus, Walker never addresses the Government's specific argument about the money in plain view.  Nevertheless, the Court will address the Government's argument.

Upshaw.  While looking behind a large chair, Deputy Douglas noticed in plain view sheets of money printed on white paper on a shelf.  (Doc. 17-1 at 5).  At the hearing, Sergeant Douglas testified the money looked counterfeit based on the color and texture and the fact the bills were printed on white paper.  To a reasonable officer, this money would immediately appear to be counterfeit.  Therefore, because the deputies were lawfully inside Walker's residence and saw in plain view money that reasonably appeared to be contraband, the evidence was properly seized.

### C. The Counterfeit Money in Walker's Pockets[4]

The Government contends the money in Walker's pockets should not be suppressed because Sergeant Douglas's pat down was a lawful *Terry* frisk.  (Doc. 20 at 8).  "[A] police officer who encounters a person during the execution of a search warrant is entitled to frisk that person if the officer has a reasonable suspicion that the person is armed or otherwise dangerous."  *United States v. Chapman*, 196 F. Supp. 2d 1279, 1285 (M.D. Ga. 2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence …."  *Adams v. Williams*, 407 U.S. 143, 145-46 (1972).  If an officer conducts a lawful pat down and touches items that immediately feel to be contraband, seizing those items is justified.  *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).  However, the criminal nature of the items must be immediately apparent; an officer cannot manipulate the items beyond what is allowed under *Terry* to determine whether the items are contraband.  *See id.* at 378-79.  In other words, similar to the "plain-view" context, the evidence must immediately appear to be contraband

---

[4] Again, the sole ground Walker raises to suppress the money in his pockets is that all of the items are fruits of the poisonous tree of the initial entry.  Thus, Walker never addresses the Government's specific arguments.  Notwithstanding, the Court will address the Government's arguments.

through "plain-touch."  *See id.* at 371 n.1, 374.  "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."  *Id.* at 373.

Here, based on the discovery of contraband, Walker's hand movements, and his nervous behavior, Sergeant Douglas suspected Walker could be armed, so the sergeant conducted a pat down.  (Doc. 17-1 at 5; Doc. 17-2 at 3-4).  Assuming Sergeant Douglas had reasonable suspicion to justify frisking Walker, the Court concludes the sergeant exceeded the scope of a lawful *Terry* frisk.  He could not have immediately felt from the "plain-touch" of Walker's clothes the money was contraband; indeed, he had to reach inside Walker's clothes to touch the money.  *See id.* at 379 ("Although the officer was lawfully in a position to feel the lump in respondent's pocket, … the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement.").

Because Sergeant Douglas's pat down exceeded the scope of a lawful *Terry* frisk, the Government must show an exception to the exclusionary rule applies that would make the evidence in Walker's pockets admissible.  The Government argues the inevitable discovery doctrine prevents exclusion because the officers would have discovered this evidence through lawful post-arrest searches.  (Doc. 20 at 8-9).  To succeed on its argument, the Government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *Nix v. Williams*, 467 U.S. 431, 444 (1984).  Furthermore, "the

prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the illegal conduct." *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984) (citing *United States v. Brookins*, 614 F.2d 1037, 1042 n.2, 1048 (5th Cir. 1980)). This means the Government must "show that the police would have obtained the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" *United States v. Virden*, 488 F.3d 1317, 1323 (11th Cir. 2007) (quoting *Brookins*, 614 F.2d at 1048).

The Eleventh Circuit addressed a similar situation in *United States v. Rhind*, where the defendants challenged whether a police officer during a *Terry* stop lawfully opened a bag with counterfeit money inside. 289 F.3d 690, 693-93 (11th Cir. 2002). The court upheld the district court's holding that opening the bag was justified under *Terry* in those circumstances. *Id.* at 694. But the court also addressed whether the inevitable discovery doctrine would have prevented the suppression of the evidence if the court had assumed the *Terry* stop was unlawful. *Id.* The court opined the evidence would still be admissible "because the officers inevitably would have discovered the evidence in a routine inventory search following [the defendant's] arrest for counterfeiting." *Id.*

In this case, the police already had probable cause to arrest Walker before conducting the pat down based on the counterfeit money in plain view. Testimony at the hearing confirmed that Walker would have been searched when booked at the jail. Thus, the officers here, as in *Rhind*, would have inevitably discovered the evidence after Walker's arrest and booking. In other words, the police would have obtained the

evidence through "virtue of ordinary investigations or leads already in their possession."
*Virden*, 488 F.3d at 1323.  Therefore, the Government has met its burden to show the
evidence would have inevitably been discovered through lawful means.  Accordingly,
the inevitable discovery doctrine prevents the exclusion of the counterfeit money in
Walker's pockets.

### D.  Evidence Found During a Warrantless Search of Walker's Residence[5]

After putting Walker into custody but before returning to the station, the officers
conducted a warrantless search of Walker's home and vehicle when no exigent
circumstances existed.  (Doc. 17-2 at 5-6).  The scope of Walker's consent extended to
places where Upshaw could be located.  Once the officers obtained probable cause of
counterfeiting, their search shifted to looking for such evidence.  At this point, the
officers should have retrieved a warrant.  *See Tobin*, 923 F.2d at 1510 ("The
warrantless search of a home is 'presumptively unreasonable.'  A warrantless search is
allowed, however, where both probable cause and exigent circumstances exist.")
(quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)) (citations omitted).  The
Government concedes the warrantless search of Walker's home violated Walker's
Fourth Amendment rights, and thus the evidence in the home seized without a warrant
should be suppressed.[6]  (Doc. 20 at 9-10).  The Government also concedes that any
statements regarding the warrantless search itself, "as far as pointing the deputies to

---

[5] Again, the sole ground Walker raises to suppress the evidence in the residence is that all of the items
are fruits of the poisonous tree stemming from the initial entry.  Notwithstanding this argument, the
Government concedes the evidence seized during the warrantless search should be suppressed.

[6] During this same period of warrantless searching, Sergeant Douglas searched Walker's car parked
under his carport and found counterfeit money inside.  (Doc. 17-2 at 6).  Walker only references this
evidence by incorporation in his fruit of the poisonous tree argument: "All evidence in all forms … must be
suppressed."  (Doc. 21 at 1).  As discussed, the Court rejects this argument.  The Government makes no
argument at all with regard to this evidence.  The Court directs the Government to state its position on
this evidence within **14 days** of this Order.

the correct rooms to locate evidence," would not be admissible.  (Doc. 20 at 13 n.4).

Accordingly, the aforementioned evidence is suppressed.

### E.  Whether Walker's Custodial Statements Should be Suppressed as Fruits of the Poisonous Tree

Walker argues that all custodial statements made are fruits of the poisonous tree

because the initial "investigation" of Walker's residence was an unlawful warrantless

search.  (Doc. 21 at 5).  Because the initial contact was a lawful "knock and talk," the

statements will not be suppressed under the Fourth Amendment as fruits of the

poisonous tree of this initial entry.  However, at the hearing, Walker specifically reserved

his challenge to the admissibility of his statements under the Fifth Amendment pending

the Court's resolution of the Fourth Amendment argument.  Therefore, the Court will not

address the admissibility of Walker's statements under the Fifth Amendment at this

time.

### IV.    CONCLUSION

For the foregoing reasons, the Defendant's motion to suppress is **GRANTED in**

**part** and **DENIED in part**.  The evidence obtained in the home during the warrantless

search after Walker was put into custody is suppressed.  The counterfeit money found

in plain view, in Walker's pockets, and in Walker's Civic is not suppressed, and Walker's

custodial statements are not suppressed as fruits of the poisonous tree.  However, the

Government is **DIRECTED** to state its position on the evidence in Walker's Civic within

**14 days** of this Order.

SO ORDERED, this 3rd day of November, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT